**LAMP et al. v. IRVINE et al.**

**Civil No. 8.**

District Court, D. Maryland.

Aug. 7, 1941.

Thomas L. Richards, of Cumberland, Md., and H. G. Shores and William Mac-Donald, both of Keyser, W. Va., for plaintiffs.

Charles Z. Heskett, of Cumberland, Md., and Lester Reynolds, of Keyser, W. Va., for defendants.

Findings of Fact, Conclusions of Law and Opinion of the Court.

CHESNUT, District Judge.

The complaint in this case is filed by Rufus Lamp and his wife and other property owners in the vicinity of his lands in Mineral County, West Virginia, against the Mayor and City Council of Cumberland, Maryland, a municipal corporation, and the individual Mayor and Commissioners of the City.

The object of the complaint is to obtain an injunction against interference with or injury to or blocking of a right of way claimed by the plaintiff Rufus Lamp and used by others of the plaintiffs for egress from their farms in Mineral County, West Virginia, near Cumberland, to a public road in the County, which, in turn, connects up with the City of Cumberland.

The allegation of the bill is that the Mayor and City Council of Cumberland in the construction of an airport within ten miles of Cumberland, and in and over this right of way has very much damaged the right of way and impeded its use, and proposes shortly, on the completion of the Airport, to entirely block off the use of the right of way.

The basis of jurisdiction of this Court is diverse citizenship, under United States Code, Title 28, Section 41(1), 28 U.S.C.A. § 41(1), the plaintiffs all being citizens and residents of West Virginia, and the defendants being individual and corporate citizens of the State of Maryland.

The first question in the case is as to the jurisdiction of this Court.

There is no doubt that there is diversity of citizenship. But two points are made against the jurisdiction. One is that the nature of the case is essentially a local action, relating to lands and real estate in Mineral County, West Virginia, and not within the territorial jurisdiction of the District Court for Maryland.

The other point as to jurisdiction is that there is not $3,000 in controversy, exclusive of the costs.

I will say only a brief word about these two points.

At first I thought the question of whether the jurisdiction existed as to the proper venue, by reason of the local character of the action, was a serious objection to the maintenance of this suit. It is a very technical proposition of venue jurisdiction in the federal courts that an action such as one of *quare clausum fregit*—q.c. f.—may not be maintained with respect to land not within the territorial jurisdiction of the Court. That subject is very fully and interestingly presented in Judge Rose's book on Federal Jurisdiction and Procedure, of which the last is the fifth edition. And in that discussion Judge Rose refers to a case decided by him in this Court some years ago, which is the Potomac Milling & Ice Co. v. Baltimore & Ohio Railroad Co., 217 F. page 665.

■ I think it is very clear that to the extent that there could be any proper claim for damages to the plaintiffs' right of way in this case, this court would not have the venue jurisdiction.

I think it fairly clear, however, on the other side, that to the extent that the relief prayed for is a personal inhibition by injunction to the resident defendants, the case may lie as within the proper jurisdiction. If the Potomac Milling case is studied, it will be noted that the doctrine is based largely on the ineffective method of relief or enforcing its orders which the Court might have, where the land affected lies in a different district, because ordinarily the enforcement process of this Court does not run outside of the District of Maryland. However, that basis for denying jurisdiction does not exist in a case where all that is asked is a personal injunction against defendants who are undoubtedly subject to the process of the Court in this case.

An analogy which I think is fairly complete is with regard to the doctrine of specific performance, where it is very generally held that a court can decree specific performance with respect to lands that are outside of the territorial jurisdiction of the Court. Counsel have referred to one or two such cases, one, the case of Municipal Inv. Co. v. Gardiner, C.C., 62 F. 954, and another case of the same nature, Frontera Transp. Co. v. Abaunza, 5 Cir., 271 F. 199.

It also may be noted that in the present case the objection based on venue, if any, was not presented in the defendants' Answer to the Order to Show Cause here why the restraining order should not be issued. And it is arguable that, even if the objection were made that this was purely a local action, it may have been waived by the failure to make the point.

I should say also that counsel have agreed that the testimony that has been taken in the case shall be treated as a final hearing and the case shall stand on the testimony for final hearing and judgment at the present time.

■ As to the other objection to jurisdiction, with respect to the amount in controversy, I find as a fact that the amount in good faith in controversy is more than the monetary sum of $3,000. This right of way which is alleged is being impaired or destroyed or blocked is shown by the testimony to have cost the plaintiff about four or five thousand dollars. And entirely apart from that the right of way is the plaintiff's ingress and egress as to his farm of some three hundred and fifty acres, which is his only method of getting in and out from his property. The plaintiff conducts a general farming operation there and sells and disposes of some of the products of his farm in the nearby City of Cumberland, and he also has a herd of some sixty dairy cows, and daily takes milk to market in Cumberland. It is quite obvious that the blocking of his right of way to and from his farm would very seriously impair the value of the farm and his business, and there is positive testimony in the case that the monetary value of that impairment would be very substantially more than $3,000, and by some witnesses estimated as much as twenty thousand dollars.

■ There are other plaintiffs in the case who own nearby lands, which also have to depend for their exit from their properties on this same roadway; and there is evidence to show that in one such other case at least there would be an impairment of the value of the real estate of the plaintiff, I think Mr. Tysinger, if the roadway were completely blocked, as there was some contention that it has been at times in this case. Of course, it is not necessary to show that the damages that the plaintiffs have actually sustained so far have amounted to $3,000. What is sought to be protected here is the property right in and to the roadway in connection with the farm, and the protection of that roadway would seem clearly to involve a monetary or pecuniary value of more than $3,000. While the defendants' answer puts in issue the existence of that monetary value, I have not heard any very serious argument from defendants' counsel that it really is not of that value.

Now, I come to a statement of the material, and I think controlling, facts with regard to the merits of the case.

First, the City of Cumberland, under what seems to be adequate legislative authority, both from the State of Maryland and the State of West Virginia, is constructing an airport, which is said to be of a public nature, and a non-profit nature, within the horseshoe bend of the Potomac River, and within ten miles of Cumberland, and in the adjoining county of West Virginia, known as Mineral County.

It is a rather unusual circumstance that a Maryland city is constructing its airport within the State of West Virginia. But the explanation for it doubtless is in the peculiar geographical conformation of the territory around Cumberland, which the Court knows very well is in a mountainous area.

The State of Maryland has authorized Maryland cities, villages or towns, as well as counties, to establish and maintain airports. And reference should be made to Flack's Annotated Code of Maryland of 1939, under the topic of Aeronautics, Article 1-A, Sections 35 to 44, in addition to which the last Legislature of the State, by special act, authorized Cumberland to construct this particular airport in West Virginia. The chapter number of the Act referred to is 651, of the Acts of 1941.

Cumberland also timely obtained from the last legislative session of the Legislature of West Virginia an act known as House Bill No 368, Laws 1941, c. 3, which, in general terms, authorizes cities of adjoining states to construct an airport within the State of West Virginia, within ten miles from the particular non-resident city.

So that I think there is no reasonable legal doubt that the City of Cumberland is acting under due legislative authority in this case in the acquisition and construction of the airport.

The financial plan by which the work is being carried on is worthy of mention, because it relates directly to the question of whether the defendants in this case are responsible for such interference as has occurred with the plaintiffs' claimed right of way. The financial plan is this: Cumberland has agreed to contribute $200,000 to the construction of this airport, and they asked the United States Government, through the Works Progress Administration, to do the actual work of constructing the airport, at an estimated cost of labor and materials, of about $3,000,000. There is no formal contract whereby the Government is undertaking to do this work. But there is a very elaborate proposal, which is made on written forms by the City of Cumberland, by its authorized officials, to the Works Progress Administration, and the papers show, or undertake to show at least an allocation of the $200,000 to be contributed by Cumberland to specific items of the work to be done and material to be furnished, and implements for doing the work. More particularly, the City of Cumberland was to acquire all the necessary land for this airport, and to pay for it out of the $200,000.

The Works Progress Administration seems to have made a subcontract with the Mauger Construction Company of Ohio to do a large part of the work of grading and leveling the ground for the airport.

I think it fairly clear from the papers that have been submitted to me, and on the testimony, that whatever work was being done over there, and to the extent that it has affected the plaintiffs' right of way, is done by the Mayor and City Council of Cumberland as principal, and the people who are doing the work should be treated as the agents of the City in the doing of the work.

The City has bought the land and has expended forty or fifty thousand dollars in acquiring it. The title to all the land is taken by the City. The Airport, when completed, is to be the property of the City. It is to be operated at the expense of the City, although it is said on a non-profit basis. And it is obviously the City itself which is authorized by the legislative authority to acquire the Airport.

There is also specific testimony that the City's engineers laid out the plan for the Airport, and supervised the construction of the Airport, have given special attention to the matter of this claimed private right of way, and there are still other features of the testimony which press me very strongly to the conclusion that whatever is being done there is done by agents of the City, or at least, the City is responsible legally for what is being done over there, although I do not mean to give a blanket opinion that every particular item or act done in and about the Airport is to be related to the City.

Next it will be helpful to an understanding of this case to state the geographical position of the right of way in relation to the Airport.

The Potomac River just south of Cumberland makes a very marked and rather extended horseshoe bend to the east. The River is possibly 100 yards wide at these points. The extent in length of the River from one side of the mouth of the horseshoe around the bend until the River comes back to what may be called the mouth of

the horseshoe is possibly seven or eight miles. The length of the land from the mouth of the horseshoe to the far bend of the river is something slightly less than three miles. The width of the land within the horseshoe at the widest point is possibly a mile and a half or two miles; and the mouth of the horseshoe is, perhaps, a mile or so wide, or maybe half a mile wide. The river is the boundary between the states of Maryland and West Virginia.

The town or village of Wiley Ford is quite near the mouth of the horseshoe, but outside of it. The right of way which is talked about in this case and claimed by the plaintiffs runs from Wiley Ford into the horseshoe, and through the Airport, and beyond it, until it finally comes to the property of Mr. Lamp. And the length of that right of way as claimed is nearly two miles. The Airport lands extend from river bank to river bank near the mouth of the horseshoe, and the lands of the plaintiffs lie within the horeshoe beyond the Airport. It is thus clear that if the roadway through the Airport is closed the plaintiffs will have no means of access to or egress from their farms, as there is no bridge over the river accessible from their lands.

It appears that Mr. Lamp, or his predecessors in title, who were his brothers, acquired their present farm of about 351 acres back in 1919, and Rufus Lamp, the plaintiff, bought out his brothers and became the sole owner of the property about 1922.

On May 6, 1922, a deed for a portion of the whole two miles of right of way was made to Mr. Lamp and his brother by a former owner of a large portion of the whole land within the horseshoe, a man named Weldon; and the portion of the right of way covered by the deed referred to, which has been offered in evidence, runs from Wiley Ford into the horseshoe and into the property which now constitutes the whole outline of the Airport, about seventy-five feet, to a place known as Tunnel Mountain. The reason for so naming the mountain is that the Western Maryland Railway runs under the horseshoe and under the Airport in a tunnel and emerges farther east on the river, and crosses the river by a bridge at that point.

The right of way continues from Tunnel Mountain over lands formerly owned by Lamp, and reserved by him when the lands were sold, through what constitutes the boundaries of the Airport, somewhat nearly bisecting it, for a distance of nearly 1200 feet more, and then the roadway still continues thereafter for quite some distance, possibly a half mile or a mile, to the property of Mr. Lamp.

The exact location of this private roadway has been a matter of a great deal of testimony, some understandable and some not quite so understandable, from various witnesses in this case.

One of the defenses put up by counsel for the defendants here is that the right of way is so vaguely described that it is not possible to say just exactly where it is, or where it was. And then there are a great many possibly technical defects with respect to several points on the two-mile right of way by virtue of deeds and conveyances and recitals, and possible relocations here and there of the actually used right of way, referred to by the defendants. So that it must be admitted that there is a great deal of vagueness as to the exact and precise title location of the right of way that is claimed, and particularly of that portion of it, or some portion of it within the confines of the Airport. Then it happens that some of the deeds referring to the right of way were made by Lamp when he sold some of his property off to other persons, and the City of Cumberland has acquired by purchase the title of these other people, so that the City also contends that it is entitled as a tenant in common to the right to use this roadway, and that as a tenant in common it can not be subject to an action for trespass on the right of way.

But I think that these questions with respect to the precise location of the right of way and the precise question as to the paper title to several portions of the right of way are not of controlling importance in this case. With respect to the exact location of the right of way, we have this definite factual situation: the right of way was an existing, used, actual *de facto* right of way for years prior to the City's Airport activities. It was well marked, it was definite, it was precise in its actual location on the ground. It was used by Mr. Lamp and his family, and used by possibly a dozen other neighboring families whose lands bordered on the right of way. It was stoned for a good part of the way, and ran up hill and down dale. And the photographs offered in evidence by the defendants here very

clearly show a definite existing road. Furthermore, the road is shown as a secondary, unimproved apparently public road on a map of the Roads of Mineral County, published by the State Roads Commission of West Virginia. There is no doubt that this right of way ran through the Airport from side to side, a distance of twelve hundred or more feet, that it was well marked and easily discernible when the City began the activities of leveling the ground for the Airport.

 So I think there is nothing of substantial objection to a decree, if otherwise proper to issue in this case, by reason of the alleged uncertainty of the precise boundaries of the roadway. I think it is no defense to the defendants to say, after they have apparently obliterated by their leveling process the boundaries of the road, that they hereafter can not tell just where the road was. Nor do I think there is any substantial objection in this case to the title of the plaintiffs to the roadway in question by any of the deeds that have been referred to. There are some niceties of argument with respect to that, but they do not touch the substance of the matter, which is that a two-mile road actually existed and was used as practically the sole means of egress from the horseshoe, bottle-neck, if you so choose to call it, by the plaintiffs in this case, in order to get to the public roads at Wiley Ford.

The next question in this case is with regard to what has been done by the defendants to this roadway.

And, of course, there is another very important question as to whether the roadway is still a private roadway or whether it is a public roadway at the present time.

First, as to the facts as to what has been done with the roadway. To a great extent the original lines of the roadway have been obliterated through the Airport by the leveling process, which is necessary for the completion of the Airport; but it is also true that at the inception of the work the City's attention was distinctly called to the existence of the roadway as it then was, and well marked. The City engineer gave instructions, as he testified, that there should be no real damage to or obstruction of that roadway. The engineer for the Mauger Construction Com-

pany was especially warned that he was to keep that roadway open, that otherwise there might be trouble with the whole Works Project from the people who claimed the right to use the roadway.

The work was begun some time in May of 1941; and this Complaint was not filed until July 25, 1941. I am satisfied from the testimony that the road surface was very must interfered with by the general work in constructing the Airport, the general leveling process. In places the road surface was cut down six feet or more; and in the process of doing that at times, unquestionably, I find from the testimony, the plaintiffs have been subjected to a great deal of inconvenience, such as necessarily flows from riding over a roadway which is practically in the course of construction.

Nevertheless, I do find from the testimony also that there has been no specific damage or loss occasioned to the plaintiffs by what has been done by the defendants in treating the roadway within the Airport. And I find from the testimony that at present the roadway is perfectly passable and is seemingly in just as good condition for use as it ever was before the Airport work was begun. The photographs which are said to be fairly typical of the present condition of the roadway for the whole distance, clearly indicate a usable dirt roadway on apparently solid ground.

The next question in the case is whether this private roadway, which undoubtedly I think existed in the ownership of the plaintiff Mr. Rufus Lamp some years ago, has been abandoned by him, or the easement therein has been lost, or whether it has been converted into a public road. I am not impressed with the argument of counsel for the defendants that private rights have been lost by virtue of any conveyances or abandonment by the Lamps. The question, however, as to whether the road has been converted as a matter of law in the State of West Virginia into a public road is a far more difficult matter. The facts with regard to that seem to be that about 1928 or '30, when the roadway was undoubtedly a privately owned roadway by Mr. Lamp, he wanted some help from the County Commissioners of Mineral County in the maintenance and the improvement of the road, and he tendered the roadway to the County for a public road. It is equally clear

that the County Commissioners refused to accept the road as a public road; although, doubtless urged by the insistence of taxpayers that something should be done for them, a few hundred dollars was spent on the road in a few consecutive years. I think the testimony is that $250 was spent in 1928, and $300 in 1930, and some small sums in other years. In 1933 the road system of West Virginia was taken over by the newly appointed State Roads Commission, and a map of the County roads or public roads in Mineral County has been published, and one copy thereof has been offered in evidence in this case, on which the testimony of the County Engineer for the State Roads Commission, a Mr. Swecker, is that the road we are referring to, called the Weldon Road, seemed to be classed or indicated as a secondary and unimproved public road. But there is no definite evidence in the case to show that the State Roads Commission has ever taken over the road, although there is some evidence that it also, from time to time, spent some money on the road. There is no record in West Virginia to show that this road has been made a public road.

Reference, however, is made to the statute of West Virginia, which is classed, I believe, as Section 3 of Title 17, paragraph number 1412, in which the word "roadway" is defined, and there is some language in that statute which indicates that a private road may become a public road if it has been used by the public for ten years, without objection, and if public moneys have been expended on it. Counsel for the defendants argue that that makes this formerly private road a public road in the State of West Virginia. We have the benefit of the presence in this case of counsel from West Virginia as well as in Maryland, on both sides of the case. Mr. Reynolds, I believe, is a West Virginia lawyer; but counsel are not in agreement as to the effect of the West Virginia statutes.

I have not been able myself to ascertain from the argument of counsel with certainty whether that general statute defining a roadway is applicable to this case. On the whole, I incline to the view that it is not. I think it takes something more than a mere definition in a statute to convert admittedly privately owned property into public property. Still, I have some

doubt as to whether the statute does not apply.

But, however that may be, I think the answer to whether it is a private roadway or public roadway is not controlling in this case. If it is a private roadway, it is very clear as a matter of law that the defendants had no right to do anything with regard to it, by entering upon it, except possibly in their capacity as owners of adjoining property bought from Lamp, and having the right to use the road for the ordinary uses of a private right of way appertaining to the land which they bought. With that exception, I think they had no right to do anything to the road; and even as owners of adjoining land their right to the use of the roadway was to use it as a roadway. I think they clearly had no right, if it was a private roadway, and even if they were co-owners of it, or co-owners of the right of way over it, to dig it up and change its grade and make it very uncomfortable and inconvenient for passage for any length of time. And clearly they have no right to close it, as will be necessary to operate the Airport. If it is a public roadway, I think the same conclusion follows in this case in so far as an injunction against the blocking of the roadway is concerned. That is to say, if we hold in this case that the roadway is a public roadway, then I do not think the City of Cumberland has any justification for putting a fence around the Airport and blocking off the roadway for 1200 feet. The testimony in the case indicates that the only way that you can properly close a public road in West Virginia now is by petition to the State Roads Commission of West Virginia—by the parties who are interested—followed by a hearing, if there is objection, and the substitution by the State Roads Commission of another road therefor if vital for the people who object to the closing of the old road. At least, that is the substance of the procedure as I understand it from the explanation given by Mr. Swecker.

The City of Cumberland has done nothing in this case to condemn the plaintiffs' right of way in this roadway, or to legally close it. It has filed no petition with the State Roads Commission of West Virginia to close the road; and it has just gone ahead as if the road did not exist, except to this extent, that it has endeavored, so far as it was practicable in the construc-

tion of the Airport, to keep the roadway open, during construction, but intends to close it upon the completion of the Airport.

 Therefore, whether the roadway is a public road or private road, I think it is quite clear that the City of Cumberland has no authority to close that roadway under existing circumstances. If it is a private roadway, they can not close it unless and until they condemn it. They have sought to condemn small portions of Mr. Lamp's property. And that case is pending in the County Court of Mineral County, West Virginia. They have not included in their condemnation the right of way belonging to Mr. Lamp or anybody else. And apparently they are not proposing to amend their condemnation case to include the right of way. It would seem to me, if I may venture the suggestion while counsel are all here, that that is a very practical and reasonable thing for the City of Cumberland to do immediately, in order to acquire title to the property. And as that condemnation case would be in a court of West Virginia, affecting lands in the county where the Court sits, there ought to be much less difficulty in local judges having a definite opinion as to whether this roadway is a private roadway or a public roadway.

If it is a public roadway and not a private roadway, then it seems to me that the City of Cumberland ought at once to file a petition with the State Roads Commission of West Virginia to have the road closed. As neither of those things has been done, there is no right, as I can see it, on the part of the City of Cumberland at the present to either injuriously affect the passability of the roadway for the plaintiffs, or to entirely block it and close it up, as apparently is proposed to be done, or will be done if the Airport is operated.

There has been a great deal of testimony in this case as to an alternative roadway which the City of Cumberland is acquiring and constructing, and which it is said ought to be regarded by the plaintiffs as a suitable alternate for the present roadway. There is objection on the part of the plaintiffs to the substitution of this new roadway. They say that while it connects up with their properties and public roads in and near Cumberland, yet it involves an extremely steep hill, the grade of which has not been stated by anybody in the case, but is admittedly a high percentage; and it also involves carrying the substituted or alternative roadway over half a mile or more along the very brink of the Potomac River, and under the Western Maryland Railway bridge, where it is very seriously anticipated, based on past experience with freshets at that point, that the roadway may be periodically overflowed by the River, and thus render it utterly unusable, resulting in the blocking of the plaintiffs' egress from or ingress into their properties for a considerable length of time.

There has been some testimony as to whether this alternative proposed roadway will be accepted by the State Roads Commission of West Virginia and maintained as a public road. I have not thought it necessary to make any findings of fact in this regard, because I do not think this Court has anything to do with that subject matter, except in so far as it shows, of course, that the City of Cumberland has not been ruthless in its activities with respect to the roadway. I think it also ought to be borne in mind that what is being done by the City is not entirely on the City's own initiative. It was an enterprise which, apparently, was brought to the City's attention by the National Defense Administration, and obviously the work is very largely public work, and the City is only a minor contributor to the fund, and is called the sponsor for the enterprise, and what it is doing is being done undoubtedly for a public work, and I do not think there is anything here to indicate that the City has been really wanton or reckless or ruthless in what it was doing. I think the work that was done, as it affected the roadway, was for the time being necessary work for the Airport, and while it has undoubtedly caused the plaintiffs inconvenience in the past, I think it is causing them no substantial damage at present, and until the roadway should actually be closed, or should be further impaired or greatly changed as in the past.

The final question, therefore, in the case is what relief the plaintiffs are entitled to. They ask for an injunction only against the trespass upon the roadway, or the digging, grading, or obstructing, or injuring the same, or causing any damage thereto, or interfering in any way with the free use and enjoyment thereof. And they ask for that as a permanent injunction, and then ask for a temporary restraining order.

I think the decree for injunction in this case should be very carefully worded, so

that it will not in any way interfere with the continuance of the work of constructing the Airport by the City. I think also, however, it should be worded in such a way that any continuance of the work as it affects the roadway within the Airport must be with the least possible inconvenience to the plaintiffs, and that is must be done without causing them or their vehicles any damages whatever, and they must at all times have free, clear and reasonably unobstructed right of way over the roadway as formerly existed, *de facto*, through the Airport.